1  did.

2      **DEPUTY COMMISSIONER BENTLEY:**  Okay, all

3  right.  Ah, have you learned the steps?

4      **INMATE PATTERSON:**  Yes, I have.

5      **DEPUTY COMMISSIONER BENTLEY:**  Okay, and

6  which ones do you practice?

7      **INMATE PATTERSON:**  Well one -- four was

8  our -- our -- our, you know, our personal

9  inventory and then step ten is to continue that,

10  ah.  And I think that that's the most important

11  two steps, is to continually take your inventory

12  of yourself and to keep checking yourself and to

13  see if you're falling back into any type of

14  these behaviors that could lead to addiction or

15  relapse and so, I think Step four and Step ten

16  are the two most important steps.  You know, you

17  have -- you have a lot of great steps, eight and

18  nine, is the amend steps and you -- along the

19  way when you do drugs ah, you understand that

20  you've do hurt a lot of people, and so -- and

21  sometimes, they're your children and they're

22  your family members and they might not even

23  realize it, but, so those steps are important

24  to, but I think four and ten.

25      **DEPUTY COMMISSIONER BENTLEY:**  And let's

26  see, I noticed ah, back in November of last

27  year, you took -- I don't know what  -- was it a

1    video program -- that job success?

2        INMATE PATTERSON:  No, no, it wasn't --

3    actually it was on the TV, but it was  -- they

4    gave us pamphlets and books.

5        DEPUTY COMMISSIONER BENTLEY:  Oh, okay.

6        INMATE PATTERSON:  And information

7    packets to fill out -- it was Transitions, Job

8    Success.

9        DEPUTY COMMISSIONER BENTLEY:  Okay.  And

10   then you've given me a chrono that -- the one

11   you haven't gotten to here

12       INMATE PATTERSON:  No, I -- yeah, I

13   didn't get those until yesterday.

14       DEPUTY COMMISSIONER BENTLEY:  And they

15   said that -- that you've completed Economic

16   Education for Consumers, a two semester long

17   Business Education in Self-Study Course for

18   Self-Improvement and you earned an A each

19   semester.  Ah, and now you've been pre-enrolled

20   in Business Math.

21       INMATE PATTERSON:  Yes, I have.

22       DEPUTY COMMISSIONER BENTLEY:  Okay.  And

23   do you have to pay for this?

24       INMATE PATTERSON:  No, no, this is

25   actually provided to students.

26       DEPUTY COMMISSIONER BENTLEY:  Oh, okay.

27   This is signed by J. Kingston, the Academic

1   Instructor.  And then we have a certificate of

2   completion in Alternatives to Violence Project,

3   and you've completed the Basic Course in Non-

4   Violent Conflict Resolution.  And this was just

5   dated August 1st, of 2006.

6           INMATE PATTERSON:  Last two days, 12

7   hours a day.

8           DEPUTY COMMISSIONER BENTLEY:  You brought

9   that in there and you requested that you get

10  these back so I'm going --

11          INMATE PATTERSON:  Yes.

12          DEPUTY COMMISSIONER BENTLEY:  -- to give

13  them back to you right.  So they don't get mixed

14  up with my paperwork.  Okay, and I noticed

15  you're on the waiting list for Anger Management

16  and Cage Your Rage?

17          INMATE PATTERSON:  I was -- I tried get

18  into Cage Your Rage but ah, but Cage of Rage is

19  for Triple CMS inmates who are currently taking

20  psychotropic or part of the Triple CMS program.

21  I'm not, so I was, of course, denied access to

22  the program, but I -- I have been attending or

23  just recently finished the Advance Anger

24  Management Course -- the Dr. Rothscroft.

25          DEPUTY COMMISSIONER BENTLEY:  Oh, okay.

26  That wasn't in --

27          INMATE PATTERSON:  That was a typo by the

1  Counsel, I had mentioned to the Counselor, that

2  I had received notice that I was on the waiting

3  list, however, ah --

4         **DEPUTY COMMISSIONER BENTLEY:**  Oh, no I

5  didn't take it from the Counselor's Report, I

6  took it from the chrono in the file.

7         **INMATE PATTERSON:**  Okay, yeah.

8         **DEPUTY COMMISSIONER BENTLEY:**  The chrono

9  that you -- that was probably the time that --

10  there wasn't anything more current than that.

11  So you did get into that program?

12         **INMATE PATTERSON:**  Yes, I was in it and

13  now since it's ended, we're suppose to be

14  getting chronos for that, so -- completion.

15         **DEPUTY COMMISSIONER BENTLEY:**  Okay, I

16  know they're slow to get into the file.

17         **INMATE PATTERSON:**  Yeah.

18         **DEPUTY COMMISSIONER BENTLEY:**  Okay, and

19  so what do you -- what else do you do in your

20  spare time, it sounds like you keep pretty busy.

21         **INMATE PATTERSON:** I, yeah, I keep pretty

22  busy.  But since ah, since my last hearing,

23  there was -- you've mentioned a couple of the

24  things, I also did a FEMA, Homeland Security

25  course, ah, I took an Anger Management course

26  through the Chapel and I took a Fatherhood and

27  Anger Management Course, also through the

1  Chapel.  This were done on 12-3-04 and 1-5-05, I

2  was taking them simultaneously, so that's why

3  the chronos are so close together.  I also

4  participated in Dr. Thomas Gordon's Family

5  Effectiveness Training and that was also an

6  anger management course.  And then, the others

7  that you mentioned first and currently two more

8  years of AA since the last.  I keep myself busy

9  with these programs.

10      DEPUTY COMMISSIONER BENTLEY:  Must be you

11  take advantage of any program that --

12      INMATE PATTERSON:  Yes, I do.

13      DEPUTY COMMISSIONER BENTLEY:  Okay, all

14  right, what else you do on your spare time?  You

15  get any visits here?

16      INMATE PATTERSON:  No, I don't.  My

17  family -- my father's getting old and he's going

18  through surgery after surgery right now, I'm

19  praying for him, I'm hoping he's going to be

20  okay.  He just had his gallbladder removed.  Ah,

21  and everybody lives down in Orange County area,

22  so, it's  -- the rest of my family, my son and

23  daughter and so I don't get visits but, my day's

24  taken up through in the morning, I try to go out

25  and continue an exercise program, where I'm

26  getting fresh air and participation in the yard

27  and in the afternoon, at 2:30, I go to work and

1 I work until 9:00 o'clock at night.  So my day,

2 I get that little window in the afternoon, where

3 I study my college courses, I just started

4 Business Math, as the chrono said.

5   DEPUTY COMMISSIONER BENTLEY:  Okay.

6 Okay, anything else you want to tell me about

7 what you've been doing?

8   INMATE PATTERSON:  No, that's ah, that's

9 pretty much it.

10   DEPUTY COMMISSIONER BENTLEY:  Well, you

11 are keeping really busy.  We just got  -- did

12 you get your Psychological Report?

13   INMATE PATTERSON:  Yes, I did.

14   DEPUTY COMMISSIONER BENTLEY:  Okay,

15 because we -- we just got it this morning, and

16 this was done by Lance Courtennoff, and he goes

17 through your diagnostic impression and he has

18 your poly-substance abuse and remission in a

19 control -- controlled environment.  And he gives

20 your Axis Five and GAF Score of 90.  He goes in

21 and talks quite a bit, because you know, there

22 was this situation where, it was considered that

23 you may have been manic-depressive or bi-polar

24 and all this stuff, and I think as in the

25 psychological reports, they've kind of addressed

26 as really being the problem with the illicit

27 substances.

76

1          INMATE PATTERSON:  Yes.

2          DEPUTY COMMISSIONER BENTLEY:  That it

3    wasn't really your mental condition, per se, it

4    was what you were doing to yourself that was

5    creating the mental condition.

6          INMATE PATTERSON:  Sure.

7          DEPUTY COMMISSIONER BENTLEY:  And they

8    said that since you've discontinued any illicit

9    substances, ah, that has been rescinded, any of

10   those diagnoses.  Ah, because I don't think you

11   ever were in any kind of mental health program

12   in the prisons, right?

13         INMATE PATTERSON:  No, no.

14         DEPUTY COMMISSIONER BENTLEY:  And he

15   talked about your participation in AA and NA,

16   and that you haven't received any diciplinaries

17   for substance abuse, and he says that you

18   describe a one time addiction to cocaine and

19   methamphetamines as stemming from the energy and

20   sense of well-being that they gave you.  Ah,

21   then after the commitment offense, you realized

22   that there was during the effect to that.  Then

23   he goes through and the reviews of the life

24   crime ah, with you and then talk about your

25   parole plans which Commissioner Bryson will be

26   talking about ah, let me see, but it talks about

27   remorse, that your attitude does not suggest

1    continued hostility or debasement toward the

2    victim.  You state that prior to the crime, you

3    admired Mr. Mabry and looking back still does as

4    being a professional on his job.  He

5    acknowledges that Mr. Mabry didn't deserve to be

6    shot and he's sorry for not only shooting him,

7    but the chronic fear that he instilled in him

8    all these years.  Under assessment of

9    dangerousness, it says in control setting and

10    violence potential is nil.  And you have not

11    demonstrated any aggressive behavior over your

12    16 years of incarceration.  And he says the

13    significant risk factors that applied at the

14    time of the commitment offense were a continued

15    pattern of heavy illicit substance abuse, which

16    caused secondary and major mood disorders, which

17    was in turn acceserated by the mixture of

18    prescriptions, psychotropic leading to

19    chronically, averment mental state.  And you

20    know you're really fortunate because sadly, I've

21    seen some of these guys that have been on meth

22    quite a while, and those mental disorders become

23    permanent.

24        **INMATE PATTERSON:**  Yes.

25        **DEPUTY COMMISSIONER BENTLEY:**  Regardless

26    of whether they're on or off, they've been off

27    the drug for some time and they're -- and ah, he

34                              78

35

1  talked about how your were using

2  methamphetamines prior to the ah, commitment

3  offense and you're no longer using drugs.  It

4  says based on the (indiscernible)offense has

5  been lax -- lack of subsequent aggressive

6  behavior, seems clear that the commitment

7  offense was not the product of a habitually

8  aggressive, criminally, oriented individual, but

9  rather an aberration, secondary to substance

10  abuse.  Says, therefore, taken with clinical

11  data, this suggests that violence potential at

12  the current time if paroled to the community

13  would as mid to low, in comparison with the

14  average inmate.  And then of course assuming

15  continued absence from alcohol and illicit drugs

16  (indiscernible).

17     INMATE PATTERSON:  Sure.

18     DEPUTY COMMISSIONER BENTLEY:  And he

19  recommends you continue with the AA and NA

20  program.  So overall, pretty positive report.

21  So, I return to the Chair.

22     PRESIDING COMMISSIONER BRYSON:  What

23  would be your parole plan for residence should

24  you obtain ah, a parole date?

25     INMATE PATTERSON:  Well, my primary

26  parole plan, and -- and I hope that happens, is

27  to go to U-Turn for Christ, down in Paris,

79.

1  California and they've sent letters the last

2  three hearings, ah, stating that they are

3  willing to accept me.  My friends, Lance and

4  Carol Smith, who now live in Los Vegas, have

5  called them and told them they would secure the

6  $800.00 but they told me, I don't really need

7  it, all I need to do is get my gate money to get

8  there.

9         **PRESIDING COMMISSIONER BRYSON:**  In fact,

10  I believe we have a letter saying --

11         **INMATE PATTERSON:**  Yeah they've --

12         **PRESIDING COMMISSIONER BRYSON:**  -- to

13  that effect.

14         **INMATE PATTERSON:**  -- yeah, they've sent

15  it.

16         **PRESIDING COMMISSIONER BRYSON:**  Okay.  I

17  will be going through all these letters ah, --

18         **INMATE PATTERSON:**  Sure.

19         **PRESIDING COMMISSIONER BRYSON:**  Okay, and

20  ah, that certainly sounds like a wise plan

21  actually. And U-Turn for Christ would be down in

22  Orange County somewhere?

23         **INMATE PATTERSON:**  No, no it's actually

24  in Riverside County, where -- my county of last

25  residence.

26         **PRESIDING COMMISSIONER BRYSON:**  Okay, all

27  right.  Ah, let me point out May 16th, 2006, we

1   do have a letter from a Sarah L. Box, last is

2   B-O-X, from the U-Turn -- she's Administrative

3   Assistant at the U-Turn for Christ Program and

4   that's the letter U-Turn for Christ.

5          INMATE PATTERSON:  Yes.

6          PRESIDING COMMISSIONER BRYSON:  Ah, and

7   she ah, says, we require, hum, all court

8   appointed residents to complete both phases of

9   the program.  Hum, requesting your office and

10  the court mandate the same, thereby, making

11  their time in the ministry a total of eight

12  months.  Hum, and we accommodate any additional

13  time for growth, okay.

14         INMATE PATTERSON:  And my contact with

15  them was to spend at least one year and

16  hopefully to ah, actually obtain employment

17  there as a -- as a counselor.

18         PRESIDING COMMISSIONER BRYSON:  I see.

19         INMATE PATTERSON:  Yeah.

20         PRESIDING COMMISSIONER BRYSON:  Okay, and

21  then the following, this is dated the same, so

22  the same letterhead from the same individual,

23  but the following page ah, says that ah, this is

24  an eighth month ah, two months phase one, six

25  months in phase two, residential program

26  survives strictly by private donations of

27  individuals such as you.  We're not government

1  or state funded, nor do we put you on any sort

2  of government aid while you are here.  Ah, we

3  keep our doors open, I ask an $800.00 donation,

4  and she says, we know that individual such as

5  yourself, just coming out of prison, can not

6  afford the $800.00 donation we ask for, so we

7  ask that you just bring us your gate money, less

8  your bus fare to Paris, California.  All right.

9  Hum, how does that work?  Did you just write

10  them or how did you strike up  --

11      INMATE PATTERSON:  Ah, actually no, my

12  friends, their from Calvary Chapels and this is

13  in Calvary Chapels and I heard about this

14  program, so --

15      PRESIDING COMMISSIONER BRYSON:  Oh, I

16  see, okay.

17      INMATE PATTERSON:  First I inquired and--

18      PRESIDING COMMISSIONER BRYSON:  That's

19  great.  So, and they would -- this program would

20  also cover your transitioning for example AA,

21  NA, that kind of involvement.

22      INMATE PATTERSON:  Yeah, yeah, they have

23  counseling programs there, but once I'm able to

24  leave then --

25      PRESIDING COMMISSIONER BRYSON:  Right,

26  all right, okay.  Ah, and here's a letter from

27  the ah, Marian Ashley, A-S-H-L-E-Y, the District

1   -- 5th District Supervisor of the County of

2   Riverside, this is a -- this is April 15th,

3   2004.

4        INMATE PATTERSON:  But --

5        PRESIDING COMMISSIONER BRYSON:  I'm

6   sorry, we have older letters that I'm not going

7   to go through, but we do have a mixture and

8   which I think sorted out of older and more

9   recent letters.

10        INMATE PATTERSON:  I can explain those.

11   This were all letter that they got from these

12   people to show that that's a good program --

13        PRESIDING COMMISSIONER BRYSON:  I see.

14        INMATE PATTERSON:  -- and they attached

15   them to their letter to the Council, they didn't

16   send me these.

17        PRESIDING COMMISSIONER BRYSON:  Okay.

18        INMATE PATTERSON:  My Counsel gave me a

19   copy, so they're kinda redundant but --

20        PRESIDING COMMISSIONER BRYSON:  I see.

21        INMATE PATTERSON:  --they were just

22   trying to -- they've sent letters three times,

23   and I think that they, through my last letter to

24   them, they seemed a little frustrated or

25   something, and I think they think when they

26   write a letter that we're just suppose to show

27   up, you know, they expect a date to be given or

83

1    something, so I think they attached this to

2    affirm their program.

3         PRESIDING COMMISSIONER BRYSON:   Thank

4    you, that makes sense.   Okay.   We also have an

5    April 27th, 2006 letter from Timothy W. Archer,

6    the owner of Country Side Homes, that are

7    builder of custom homes ah, he says, I

8    understand from my neighbor, Kenneth Patterson,

9    that's your father, is that correct?

10        INMATE PATTERSON:   Yes.

11        PRESIDING COMMISSIONER BRYSON:   That his

12   son is due for parole ah, I also understand ah,

13   Jody has past experience in most phases of home

14   building, plus he reads, understands plans and

15   specifications.   I'm a builder of custom homes

16   and could always find a place for a person with

17   those qualifications in my crew.   Now, so

18   recognizing your experience, in that area, and

19   also, myself being a little bit familiar with --

20   with home building, ah, clearly that -- that

21   lifestyle still involves the use of drugs by a

22   lot of people who are in that industry and so,

23   obviously, is that something you thought about?

24   Going right back into work that -- where workers

25   are potentially using drugs.

26        INMATE PATTERSON:   I guess that could

27   always be a concern but when I was out there

84

1  using drugs on the jobsite, there were lots of

2  people around me who didn't, and they ah, and I

3  even knew people who were recovering alcoholics

4  and addicts, back then and they didn't use, I

5  mean, --

6          PRESIDING COMMISSIONER BRYSON:  Okay.

7          INMATE PATTERSON:   -- it's a

8  determination for you not to use and that's --

9  that's my determination.  So I don't care if you

10  covered this table in drugs right now, it's just

11  not my thing anymore.  And so I'm not -- not

12  worried about, but it's always a conscious

13  thought, that you've got to keep that in the

14  back of your mind.  If, you know, they say, once

15  an addict, always an addict.  And that's the

16  mentality you have to have, and so, yeah, I --

17  you -- it's going to be around if I worked in

18  construction or if I worked in an office

19  building, you know, there's people in office

20  buildings that do drugs to.  It's just if you

21  allow yourself to follow that person to their

22  home, and you want to start partying with them

23  at the bars and all that thing, ah, you're going

24  to end up in the same type of lifestyle that

25  they're in, and maybe some place like this so.

26          PRESIDING COMMISSIONER BRYSON:  Okay, ah,

27  we have a letter from Robert Rubacalva, your

41                                          85

1    brother-in-law?

2        INMATE PATTERSON:  Yeah, that's my

3    brother-in-law.

4        PRESIDING COMMISSIONER BRYSON:  Okay, ah,

5    again he writes a very supportive letter that's

6    dated April 2nd, 2006.  Ah, we have a letter of

7    support from Lance Smith, ah, who's known you

8    for nine years and he says his wife introduced

9    you.  Ah, he said they'd be glad to offer their

10   home to you, while you get your feet on the

11   ground.  We have a letter from a friend, for 15

12   years, hum, and this is --

13       INMATE PATTERSON:  Monica?

14       PRESIDING COMMISSIONER BRYSON:  I believe

15   so, Dournish?

16       INMATE PATTERSON:  Yeah.

17       PRESIDING COMMISSIONER BRYSON:  Okay, and

18   who is that person?

19       INMATE PATTERSON:  That's ah, Carol's

20   daughter, that's Lance's step-daughter.  The

21   letter you just read.

22       PRESIDING COMMISSIONER BRYSON:  That's a

23   good letter of support.  We also have ah,

24   basically a job offer, but I believe it's in

25   Nevada.

26       INMATE PATTERSON:  Yeah.

27       PRESIDING COMMISSIONER BRYSON:  Leroy

1   Papkey?

2       INMATE PATTERSON:  Yeah, that's Lance's,

3   I mean ah, well that's actually almost Lance's

4   step-son, because he's ah, engaged to Monica.

5       PRESIDING COMMISSIONER BRYSON:  I see.

6       INMATE PATTERSON:  And he heard that it,

7   you know, that I could use a job offer and he's

8   a Manager at ah, ah, -- I don't know, at some

9   kind of Tire Company or --

10       PRESIDING COMMISSIONER BRYSON:  Yes, yes

11   it's --

12       INMATE PATTERSON:  -- gas station.

13       PRESIDING COMMISSIONER BRYSON:  -- called

14   (indiscernible) Brakes.

15       INMATE PATTERSON:  Yeah, okay, yeah,

16   yeah, brake company.

17       PRESIDING COMMISSIONER BRYSON:  Okay.

18       INMATE PATTERSON:  Just an offer and he

19   just through it out there.

20       PRESIDING COMMISSIONER BRYSON:  That's

21   very nice.  All right.  Ah, then we have a

22   letter from Carolina N. Smith, who I believe is

23   the wife of Lance.  Is that correct?

24       INMATE PATTERSON:  Yes.

25       PRESIDING COMMISSIONER BRYSON:  Okay, and

26   that's also a support letter.

27       INMATE PATTERSON:  Yeah, she used to be

1    my fiancée.

2            PRESIDING COMMISSIONER BRYSON:  That's

3    what I understand from the letter.

4            INMATE PATTERSON:  Yes.

5            PRESIDING COMMISSIONER BRYSON:  Okay.

6    Ah, then we have a support from Joseph

7    Stevenson.

8            INMATE PATTERSON:  Yeah.

9            PRESIDING COMMISSIONER BRYSON:  And he

10   says he met you through his mother when he was

11   eight years old and so he -- but he does say

12   that you remain one of the only father figures

13   in his life.  So that's quite a testament and he

14   goes into that  -- he says ah, you've been  --

15   you've kept him optimistic and you've ah, -- he

16   says I have a steady job going on for four years

17   now and I get to coach kids wrestling, which has

18   always been my dream.  And he says that you're

19   the in source of inspiration in his life.

20   That's a very good support letter.

21           INMATE PATTERSON:  Yeah, but I'm

22   responsible for his ah, ultimate fighting

23   adventures.  He's ah, welterweight champion in

24   Ultimate Fighting right now, out there in Vegas.

25   So, and he did that in his own.

26           PRESIDING COMMISSIONER BRYSON:  Did that

27   on his own, good.  Ah, I believe, hold up, I

44                                          88

1    have something in the letter or two here -- I

2    had a few things in transition here ah, did I

3    mention the letter from your daughter?

4         INMATE PATTERSON:  No.

5         PRESIDING COMMISSIONER BRYSON:  That's

6    from April Patterson.

7         INMATE PATTERSON:  Yeah.

8         PRESIDING COMMISSIONER BRYSON:  Okay.

9    And again, she gives you ah, she says, she can't

10   offer a home or money but she can -- she's

11   offering to be your daughter once again.  I

12   think that says quite a lot.  Hum, we have Darcy

13   and Kimberly Kinito?

14        INMATE PATTERSON:  Coniato.

15        PRESIDING COMMISSIONER BRYSON:  Coniato,

16   thank you.

17        INMATE PATTERSON:  That's my nieces.

18        PRESIDING COMMISSIONER BRYSON:  That's --

19   okay, in Wellsville, New York.

20        INMATE PATTERSON:  Yes.

21        PRESIDING COMMISSIONER BRYSON:  All

22   right, hum, a very nice --

23        INMATE PATTERSON:  I didn't get that

24   letter but I got a letter stating that they sent

25   it, so I didn't get a copy of that one.

26        PRESIDING COMMISSIONER BRYSON:  All

27   right, well, let's give it to you then, you can

1    get copies made and then you'll have the

2    original.

3              INMATE PATTERSON:  Thank you.

4              PRESIDING COMMISSIONER BRYSON:  That --

5    that would be the important thing to do there.

6    Okay.  You do have a copy of the letter from

7    your daughter, do you?

8              INMATE PATTERSON:  Yes.

9              PRESIDING COMMISSIONER BRYSON:  Okay, all

10   right.

11             INMATE PATTERSON:  Should be a letter in

12   there from my father to.

13             PRESIDING COMMISSIONER BRYSON:  All

14   right, that's the next one.

15             INMATE PATTERSON:  Oh, okay.

16             PRESIDING COMMISSIONER BRYSON:  Yeah, and

17   this is dated June 17th, 2006 from Kenneth E.

18   Patterson in Wildomar, and he says, to re-affirm

19   my intentions to support my son Jody, if and

20   when he's paroled I'll assist him to the best of

21   my ability in getting employment,

22   transportation, housing or whatever he needs.

23   Ah, and he says that I'm not doctoring Jody's

24   actions, but I'm stating that keeping

25   incarcerated longer than he already has been, is

26   in my opinion counter-productive.  All right,

27   Counsel, did I cover everything as far as you

46                                    90

1    know?

2          ATTORNEY HALL:  Yes, I think so.

3          PRESIDING COMMISSIONER BRYSON:  All

4    right, we sent out 3042 notices, as notices go

5    to agencies having a direct interest in your

6    case.  We have a representative of the Orange

7    County District Attorney's Office present who

8    will have the opportunity to make a statement

9    regarding parole suitability prior to the

10   conclusion of this hearing.  Commissioner

11   Bentley, you have any questions of the inmate?

12         DEPUTY COMMISSIONER BENTLEY:  No, I

13   don't.

14         PRESIDING COMMISSIONER BRYSON:  All

15   right.  Does the District Attorney of this

16   inmate?

17         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  I

18   have a few questions.

19         PRESIDING COMMISSIONER BRYSON:  Okay.

20         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

21   One of the things the inmate talked about in

22   relation to the 2004 disciplinary write up, is

23   about the work refusal to pass out food and he

24   mentions "there's a group of us white inmates

25   who came to that decision" -- what I would like

26   to know is since he's been incarcerated has the

27   inmate joined any Arian Brotherhood or other

1   white supremacists type  gangs?

2          INMATE PATTERSON:  No, I have not.

3          DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

4   Does the inmate, if the Commissioner could

5   follow up with this, does the inmate have any

6   prison tattoos with the words "white pride" on

7   him?

8          INMATE PATTERSON:  Yes, I do, I have

9   white pride on my back arms.

10          DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

11   And may the Commissioner ask, why he got those

12   tattoos and what those mean?

13          PRESIDING COMMISSIONER BRYSON:  Yes, and

14   I have that question to.

15          INMATE PATTERSON:  Yeah, when I first

16   came to prison, they had ah, -- they have all

17   these different groups of people and you could

18   be the white power or the Arian Brotherhood or

19   these different gangs, that peop -- that were in

20   prison and -- or we had options is  -- you know,

21   I just coming in and you could just say you were

22   proud to be white, and that's all white pride

23   is, is not part of any kind of prison gang.

24   White power, Neo-Nazi skinhead or all them

25   groups, the Arian Brotherhood, those are the

26   prison gangs.  I put those words on my back arms

27   and -- and now, in reflection 16 years later, I

1    guess I wouldn't have, but you know, it's just

2    that all it was is a statement that I was proud

3    to be white.

4         PRESIDING COMMISSIONER BRYSON:  So you

5    chose to have the tattooing done.  That's not

6    something that -- that was part of the culture

7    that you had to do, is that correct?

8         INMATE PATTERSON:  Yeah, yeah, I made

9    that -- I made that decision, I mean, I already

10   had tattoos when I came to prison --

11        PRESIDING COMMISSIONER BRYSON:  Aha.

12        INMATE PATTERSON:  And so when that

13   suggestion was made to me, you know, I was just

14   coming in, I'd -- you know, I was real

15   susceptible to ah, you know, what was going on

16   in the prison system and how am I suppose to do

17   things and where am I suppose to go and what do

18   I -- how do I dress to chow, you know.  So

19   everything, all those decisions, people were

20   telling me how you're suppose to act and so

21   yeah, way back then, I ah, I made decisions like

22   that.  Put white pride on my back arms, but I

23   never did join any gangs.  The only gang I'm

24   part of is I'm a Christian, so.

25        PRESIDING COMMISSIONER BRYSON:  You

26   understand the importance of the 115, though.

27        INMATE PATTERSON:  Yes.

49                                      93

1          PRESIDING COMMISSIONER BRYSON:   Okay.

2    Did you -- and I understand  -- we know what

3    it's like inside, okay, so, that's not a myth,

4    but did you fear for your life, for your very

5    life, if you didn't hang with the rest of them

6    in this -- in this --

7          INMATE PATTERSON:   You know, this was

8    north facility, I don't know what you know about

9    North, right now?   I was over there back in the

10   '90, it was real common and nobody would've been

11   in fear of anything then, you know.   And all

12   everybody did then was feed the cats, but this

13   new ah, north facility when they turned it to

14   level three, yes, there was ah, there was a

15   level three element to that yard and they --

16   they, you know, I just got moved over there and

17   this is what they said, I became a porter, and

18   these guys met this big group and they have

19   their shot callers and the shot callers are

20   saying we don't do this no more and everybody

21   said, we don't do it, so, I just couldn't do it.

22   I mean, I don't know whether, I'd of got killed

23   or just -- or stabbed, maybe I'd of had -- you

24   know, got attacked or jumped, I didn't know.

25         PRESIDING COMMISSIONER BRYSON:   Did you

26   know how important it is to stay discipline

27   free, as we say?

1        **INMATE PATTERSON:**  Yes, I do.

2        **PRESIDING COMMISSIONER BRYSON:**  If you're

3    going to get out of here.

4        **INMATE PATTERSON:**  Yeah, I hate getting

5    those -- and you know, that's a stupid 115.  You

6    know, I hated getting that 115, when I went in

7    to see the -- the Lieutenant that heard it, and

8    he said, I'm going to just -- I'm going to drop

9    this down to an administrative counsel and

10   reprimand it.  He said, 'cause he understood

11   what was going on.  I didn't like getting that,

12   I -- I even tried to talk to my boss and tell

13   him, look, I -- I clearly would prefer not to

14   get this 115, but he had several whites, that

15   didn't feed this  -- you know, help with the

16   trays, I was a porter, I -- I did offer to come

17   out and sweep, they didn't say nothing against

18   that, but ah, ah, you just couldn't help feed

19   the trays, cause that's assisting the officers.

20   So it was several whites that got 115s that day,

21   so he couldn't just make an exception for me, so

22   I had to take the 115.

23       **DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:**

24   The next question I have is, as far as the

25   commitment offense, without talking about it, if

26   the Commissioner could ask, if the inmate puts

27   blame for the commitment offense on his drug use

1  at that time?

2      **INMATE PATTERSON:**  No, because ah, no one

3  ah, ah, told me to use drugs.  I chose to make

4  that decision.  Sometimes we have to take

5  ownership, of the mistakes we make in life, and

6  one of those things that was my decision to use

7  drugs, in the face of, all my loved ones,

8  telling me not to.  So I take full

9  responsibility for that action, and it wasn't

10  drugs, you know, we can have excuses and I'll

11  always say, yeah, hadn't I been under the

12  influence of drugs, I probably wouldn't have

13  done it, but because I was under the influence

14  of drugs, that was my decision to do the drugs,

15  therefore, I'm responsible for any action that

16  occurred after the use of the drugs, so, I take

17  full responsibility for this crime.

18      **DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:**

19  The next question I have is, prior to the

20  commitment offense, it appears that the inmate

21  was on pres --

22      **PRESIDING COMMISSIONER BRYSON:**  Okay,

23  this is side two in the Subsequent Parole

24  Consideration Hearing for Jody Patterson, CDC

25  Number E-88649.

26      **DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:**

27  Okay, the next question I have is, it appears

1    prior to the commitment offense, the inmate was

2    taking prescription medication, anti-

3    depressants.  What I would like the inmate to

4    answer is, at some point before the commitment

5    offense occurred did he stop taking this anti-

6    depressant medication?

7         INMATE PATTERSON:  Yes I did.

8         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

9    And how much before?

10        INMATE PATTERSON:  Actually, I was

11   messing with it, taking it on and off for

12   probably a month or so before, but I believe --

13   and I'm thinking back now, it was a couple of

14   weeks.  A couple weeks prior to the -- I'm not -

15   - I -- I don't really -- sure, but there was a

16   time -- a period of time there, between two

17   weeks, a month or something, that I'd just stop

18   taking it and then I would take it, a day or two

19   and then -- I didn't like the way it made me

20   feel, so I wouldn't take it.

21        DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

22   Next question I have, if the Commissioner could

23   ask, does this inmate feel that he received a

24   fair jury trial?

25        INMATE PATTERSON:  Yes.

26        DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

27   And finally, I would just like to know if the

54

1    inmate attends any sort of church on a regular

2    basis.  I know he spoke about connections with

3    Calvary Church.  I would like to know any sort

4    of church he attends here, if at all.

5         INMATE PATTERSON:  Yes, I do.  Every

6    Saturday, I go -- it's 1:30 in the afternoon ah,

7    I also do my in-cell bible studies, I'm

8    participating in a bible study group on Tuesday,

9    and we have a gathering, a group on Sunday

10   afternoon, out in the yard.

11        DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  I

12   have no other questions for this inmate.

13        PRESIDING COMMISSIONER BRYSON:  Counsel,

14   you have questions for the inmate?

15        ATTORNEY HALL:  Yes, thank you.  Mr.

16   Patterson, could you tell the Panel how you feel

17   you've benefited from the various anger

18   management courses you've taken?

19        INMATE PATTERSON:  Yeah, I mean ah, one

20   is it's anger management.  A lot of people have

21   this ah, feeling that anger is a bad thing, I

22   think anger can also be a passion.  It's just

23   how you control it.  If you allow it to ah, to

24   ah, blow up in your face and you -- and ah, you

25   can react but, I -- I think the anger management

26   courses that we take, especially the one that I

27   just attended, the last two days ah, teaches us

1  that ah, there's reactions and -- are just you

2  know, are figments of our imagination.  We ah,

3  we over-react, if we would stop, take a breath,

4  think, instead of just re-acting, spur of the

5  moment, sometimes it's a matter of listening to

6  people, or listening to your own self, but you

7  know, sometimes we go against our own advice,

8  so, anger management courses just bring that to

9  light and keep that in the forefront in your

10  mind, and so you practice this.

11      ATTORNEY HALL:  How do you feel about

12  what you did to Mr. Mabry?

13      INMATE PATTERSON:  I ah, like I said

14  earlier to you ah, that you know, it's one of

15  those things you wish you could turn back time

16  ah, I ah, this was a terrible thing.  You know,

17  I didn't have any problems with Mr. Mabry, as a

18  person.  I respected him on the job and I feel

19  terrible that I -- that I would do this to

20  anybody and especially to him.  I mean, somebody

21  I knew ah, and you know what -- you -- you think

22  back and you realize all the different things

23  you've done in your life, and some of them are

24  just ones that you face everyday, and you -- you

25  it's -- I'm -- I'm very sorry, very sorry.

26      ATTORNEY HALL:  Now your religious faith

27  and religious studies, have those helped you in

55

99

1    your substance abuse ah, fight or sobriety,

2    keeping sobriety and helping you to stay -- to--

3    to have better judgment.

4          INMATE PATTERSON:  I -- I think that they

5    play a role, even the 12 Step Programs, AA and

6    NA are -- are God centered, you know, higher

7    power programs, so I think, you know, God does

8    play a role, but ah, it's -- it's our

9    determination, you know, we -- we live here in

10   the free world and ah, it's our choice to do

11   things, you know ah, I believe that God supports

12   us and is there to help us but ah, you know, you

13   see too many people that sit there and they, you

14   know, and they were going to church and leading

15   a God fearing life and then all of a sudden,

16   they're using drugs and committing crimes, so,

17   you know, if you -- if the person doesn't have a

18   determination to stay off the drugs, ah, God or

19   I don't think anybody can help them.  But I do

20   believe God's there to support us when we make

21   the decisions to do it.  So, I think it helps.

22         ATTORNEY HALL:  Thank you, no further

23   questions.

24         PRESIDING COMMISSIONER BRYSON:  Then I'd

25   like to invite the District Attorney to make the

26   closing statement.

27         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

1    Thank you.

2         PRESIDING COMMISSIONER BRYSON:    A hum.

3         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:

4    In looking at this offense, which happened

5    approximately sixteen years ago, one sees a

6    great amount of sophistication, planning,

7    premeditation, which occurred in this crime.

8    And what's ironic is, in looking at, the

9    inmate's statement about the crime over the

10   years, it has changed.  What was presented at

11   trial and what the jury found the inmate guilty

12   off, is the fact that this inmate, because of

13   whatever sort of work dispute, or problems he

14   had at the time with Mr. Mabry, became angry,

15   became obsessed with killing Mr. Mabry.  And one

16   of the things significant which came out in the

17   trial, and as evidenced in the Probation Report,

18   is the planning that took place.  Approximately

19   one week before this shooting, the inmate went

20   to the target range and practiced firing this

21   particular rifle.  When he practiced firing this

22   rifle with his neighbor, he made the statement

23   to his neighbor, this is what I ought to do to

24   Matt.  This is what I ought to do to the victim;

25   making these statements a week before this

26   incident.  He further made these threats to his

27   wife at the time that he became upset, that I'm

1    really -- I'm going to kill Matt Mabry and that

2    she didn't take him seriously.  Leading up to

3    the shooting, the day before, this inmate

4    followed and stalked Mr. Mabry, from his

5    workplace.  And fortunately, on that particular

6    date, Mr. Mabry was able to allude him and the

7    inmate does admit, in the Probationary Report,

8    that he did try going after him, the day before.

9    What it also shows, is in looking at the

10   inmate's statements, in the Probationary Report,

11   the inmate states and puts much of the blame on

12   the fact that he did not receive a fair trial.

13   That he should not have been convicted of

14   attempted First Degree Murder.  That he only

15   tried to scare the victim, at this time.  He

16   also mentions in this Probationary Report and he

17   tells us, ah, today, that he did stop taking the

18   anti-depressant medication a few weeks before

19   the shooting.  Yet when you look at that

20   statement and look at what he told the Probation

21   Officer, as far as, the jury should never have

22   convicted me because I was off my medication.

23   And if I had a good doctor as an expert, it

24   would have showed a -- a negating of my intent

25   to kill.  Showing more planning, as far as not

26   only taking steps to commit this crime and to

27   kill Mr. Mabry, but also setting up the

5B                                              100