1    potential for any defense at trial.

2    Furthermore, in looking at the inmate's

3    statement, although, he did not speak about the

4    crime today, it was during the 2004 hearing,

5    where he first admitted to the Board, that he

6    did intend on killing Mr. Mabry on that day.  In

7    all of the prior statements, the 2003 Board

8    Report, he states, I just wanted to hurt him.

9    In 1998, he states, I could not kill this man, I

10   only wanted to hurt him, I only wanted to kick

11   his ass.  Yet all of a sudden, in 2004, he's

12   changed his tune and now finally admits, I did

13   want to kill him, I did intend to do that.  Of

14   more concern to the people of Orange County, is

15   the fact that his 115s have all come recently,

16   over the last four years.  And what is of

17   particular note, is all of his 115s and

18   reductions to administrative notices to him,

19   have to do with his work behavior, refusal to

20   serve food, refusal to follow orders, which is

21   of concern because this was a work-related

22   attempted homicide, in this case.  And if the

23   inmate is basing the stressing of work, within a

24   control environment, such as the prison

25   facility, what will he do once he's on the

26   outside and he does not have that stable source

27   of bed, food, shelter, as provided to him by the

1    state.  It's clear that over the last three or

2    four years, he has had problems with his work

3    functions.  Of also note, is the fact that the

4    basically lied today, when we first asked him

5    the question, as far as any sort of membership

6    in a white pride organization, Arian brotherhood

7    type organization.  Yet when asked about his

8    tattoos, he does admit having white pride

9    tattoos and it's somewhat a slap in our face

10   when he states, well, it has nothing to do with

11   any sort of white power groups, it's just simply

12   expressing, I'm proud to be a white person.  All

13   of us know, that you do not receive white pride

14   tattoos just because you're proud to be a

15   Caucasian in this society.  And when you look at

16   those tattoos in reference to his 2004

17   discipline, where he admitted that he followed

18   the advice of other white individuals, that were

19   shot callers, that shows a continuing membership

20   in a white, Arian type gang organization, here

21   in prison.  Ah, the other main area of concern

22   for the people, is in the area of anger

23   management and although he's on the wait list

24   for a few good programs, one must wonder why

25   hasn't he undertaken to read books on anger

26   management on his own.  I have seen other

27   inmates at lifer hearings, come in with a whole

1    litany of book reports and dealing with

2    subjects, such as, anger management type issues.

3    I commend him for all of the NA and AA work he's

4    done, but I believe further progress must be

5    done in the areas of anger management as well.

6    And for all those reasons, the people of Orange

7    County, request that his parole be denied.

8         **PRESIDING COMMISSIONER BRYSON:**  Thank

9    you.  All right, I'd like to invite Counsel to

10   make a closing statement.

11        **ATTORNEY HALL:**  Thank you.  We believe

12   that a, first place, this Panel should start in

13   assessing ah, Mr. Patterson's suitability for

14   parole, should be -- is the insight ah, that

15   he's developed over the years.  Ah, the extent

16   to which he has learned that he has gained

17   sobriety, that he has learned how to stay clean

18   and sober, his history of remaining clean and

19   sober because, in fact, his drug addiction, drug

20   usage, really presaged this crime.  Here we have

21   a -- a person who grew up in a fairly stable

22   family, being supported by his mother, living

23   with his siblings, attending and graduating high

24   school.  Here's a young person, started out

25   working, purchasing a home at the age of 23, you

26   have a person who is on the course of striving

27   to become better and doing better.  And in fact,

```
 1  was succeeding, but for the affliction that,
 2  unfortunately, affects too many of us, not to
 3  many of us, but to many of our young people,
 4  which is drug addiction.  And this is where ah,
 5  ah, my client stumbled.  Mr. Patterson stumbled
 6  in seeking the illusory, good-feeling, or
 7  whatever it is, that drugs do for people.  What
 8  he has done, however, since this crime, which he
 9  takes full responsibility for, this man has
10  never said, I never did it.  He's never
11  attempted to ah, shun responsibility.  The fact
12  that ah, when he's going through the trial of
13  this case, he talks about defense and when ah,
14  ah, defense strategy -- with his attorney, and
15  all of that  -- the fact is that we're not here
16  to retry the case, ah, he was convicted of First
17  Degree Attempted murder.  That's a given, that
18  is the record.  We cannot go back and change it,
19  nor should we attempt to retry this case.  Ah,
20  what we should look at is, what has he done
21  since then.  Is he the same person?  If we put
22  him back on the street, is he going to go and
23  stalk Mr. Mabry and try to harm him?  And in
24  fact, all the evidence shows that that will not
25  be the case.  All the evidence shows is that
26  this is a person who has come to understand, the
27  nature of drug addiction, the nature of drug
```

1    usage and how that relates and impacts his

2    condition, and he has learned that.  We look at

3    the -- the psychological report by Dr. Portnoff.

4    Well, the doctor points out that Mr. Patterson

5    in the 16 years since the offense, there is no

6    evidence ah, that he has continued to abuse

7    illicit substances, and has shown an awareness

8    of addiction to them, and the deleterious

9    consequences of that addiction.  Based upon his

10   lack of prior aggressive offenses and lack of

11   subsequent aggressive behavior, it seems clear

12   that the commitment offense was not a product of

13   an habitually, aggressive, criminally, oriented

14   individual, but rather an aberration secondary

15   to substance abuse and substance induced mental

16   disorder.  Therefore, taking together with

17   clinical data, this suggests that his violence

18   potential at the current time, if paroled to the

19   community would be estimated to be low in

20   comparison with the average inmate assuming

21   continued abstinence from alcohol and illicit

22   substances.  Mr. Patterson has presented to this

23   Panel, his clear plan to get into a treatment

24   program through the U-Turn for Christ.  Here he

25   has ah, ah, supported environment, a supported

26   community, a community that will address him,

27   continue to address his substance abuse.  He

64

1   understands the need for continued substance

2   abuse prevention, care and counseling and he

3   will continue to do it.  On top of that, he has

4   the support of his family and other community

5   people there, to help him to go.  He has clear

6   insight, as Dr. Portnoff points out, so he

7   understands what he needs to do.  In prison,

8   this Panel knows quite well, that there are

9   certain things that are not like outside in the

10  free community.  There are certain constraints

11  ah, certainly ah, inmates have to be careful ah,

12  in -- in -- in trying to preserve their

13  security.  Ah, in Mr. Patterson's case, that

14  work stoppage ah, that 115 that he got, there

15  was a clear concern for his personal security

16  that he would not go and serve the trays as the

17  group decided.  Now, we can sit and look at it,

18  and say, he should have followed the rules.  I

19  think it -- it's -- it's an inadequate

20  comparison to talk about work in the outside

21  community versus work in here.  In here, there

22  are people who violate the rules, obtain weapons

23  or if no weapons, use their face or feet or

24  boot, whatever is available to them, to cause

25  harm to other inmates, if they violate the code.

26  And Mr. Patterson did not form any kind of group

27  or -- or agree with any conspiracy to harm

```
 1    another person.  What he did was, in trying to
 2    preserve, his own security, he did not do the
 3    work, he did not provide the -- the work on the
 4    trays, as essentially, the group decided to do.
 5    This Panel knows that and I would be foolhardy
 6    for Mr. Patterson to have crossed that line.
 7    And I think this Panel understands that.  What
 8    Mr. Patterson has done, however, is to do the
 9    best he can with his own programming, ah, he
10    understands that he has an anger management
11    problem.  And in talking about the lack of anger
12    management classes, as the Deputy District
13    Attorney tries to point, I think that's in --
14    it's -- it's inaccurate, to the extent that if
15    you look at Mr. Patterson's record, you see,
16    just since the last hearing, he has taken the
17    anger management course offered by Dr. Thomas
18    Gordon, he has done, Advance Anger Management
19    group by Dr. Roscroft, he has done Alternative
20    to Violence and not to mention AA and other
21    programs.  So indeed, he has continued to work
22    on his anger management problems.  Ah, and
23    certainly, I think that person sitting before
24    you today, I don't think can properly or
25    accurately characterized as a person who
26    continues to have an anger management problem.
27    Here's a person who has not violate the rules by
```

65                                    109

1   any act of aggression, either as a minor, ah,

2   apart from the commitment offense, he has had no

3   history of violence or aggression against anyone

4   and has ah, throughout the institution, as far

5   as my record shows, he has not committed a 115

6   involving any violence, any drug or alcohol

7   usage, or possession or use of any weapons.

8   Again, here's a person who clearly has learned

9   that he causes a grievous harm to Mr. Mabry and

10  is bent on not ever repeating that. Finally,

11  with respect to Mr. Patterson's parole plans, as

12  I mentioned before, and this Panel has seen, he

13  has ah, solid plans, in the sense that he has U-

14  Turn for Christ, he has ah, ah, marketable

15  skills, ah, this is a person who's ready ah, to

16  be paroled at this time. We believe that when

17  this Panel sits to deliberate, to determine

18  whether or not Mr. Patterson would pose an

19  unreasonable risk of harm to the community, if

20  he were to be released, the conclusion has to be

21  that he would not pose an unreasonable risk of

22  harm. The only indication that there may be any

23  -- any risk of harm, would be if this Panel

24  looks solely at the commitment offense. We --

25  we contend that that by itself should not

26  suffice. At the time that Mr. Patterson was

27  sentenced, the Court struck the ah, the

1  enhancement for the weapon, stating ah, in the

2  minute order, the Court cannot find ah, pattern

3  of violent conduct and victim was not

4  particularly vulnerable.  That was what the

5  Court wrote in the minute order at the time of

6  sentencing.  We believe, Commissioners, that Mr.

7  Patterson has demonstrated that he is -- made

8  the best use of his time, here at the

9  institution, that he is ah, he has expressed

10  genuine and deep felt remorse for having

11  committing this crime, that he has demonstrated

12  that he can be out in the community and be a

13  contributing citizen, that no one would be at

14  risk in anyway, shape or form, that he's

15  committed to sobriety.  We believe that he has

16  many tools ready to work on his part.  The tools

17  that he's learned through anger management,

18  through substance abuse prevention and through

19  his strong religious faith and for those

20  reasons, Commissioners, we ask you to grant him

21  parole at this time.

22        PRESIDING COMMISSIONER BRYSON:  Thank you

23  very much, Counselor.  All right sir, I'd like

24  to give you this opportunity to address this

25  Panel regarding your suitability for parole.

26        INMATE PATTERSON:  Yes, one, I have made

27  many steps and taking many programs, including

1   the ones just mentioned by my Counsel, and also

2   numerous programs since ah, since becoming

3   incarcerated, including a previous -- prior --

4   Alternatives to Violence, I've taken literacy

5   life skills help program with -- to doctor --

6   Dr. Torriny ah, I've also taken ah, ah, ah, as

7   we talked about the welding.  I completed

8   creative writing, I completed a 12 week

9   addiction recovery program, back in '99,

10  completed a 14 week impact program, victim's

11  awareness, through ah, ah, the prison here.

12  This was also in '99, Entrepreneurial

13  Development, Think and Grow Rich, and I -- I

14  also completed a one year course with the

15  institute of children's literature and writing

16  and publishing, which I just received a diploma

17  for.  The -- the Deputy District Attorney stated

18  that I had not -- I was on the list for several

19  programs, I think that that's been clearly ah,

20  contradicted with the fact I've taken numerous

21  anger management courses and every list I've

22  been on  -- but he also made a comment that I

23  didn't do any books.  And through Dr. Cardswell,

24  I have my chrono, I do read self-help books for

25  therapy and ah, and I -- I feel those are --

26  those are quite important.  And they're in the

27  library, they're available to us and ah, I do

68                                              112

1  take advantage also.  Mrs. Cardswell has

2  provided those books ah, partly at her expense,

3  for our benefit and they're all red-labeled

4  books in the library, and ah, and for that

5  particular one there, was Manhood 101 and ah,

6  and it was -- it's man's responsibilities in

7  society from the time of becoming a teenager,

8  when manhood starts, so.  So, I think that the

9  record should reflect that I have made numerous

10  changes to not be that individual that I was

11  back in February of 1990, and I hope that the

12  Board today will see that, thank you.

13          PRESIDING COMMISSIONER BRYSON:  All

14  right, thank you.  We'll now rec -- just one

15  moment.  Okay.  In accordance with Penal Code

16  Section 3043b, victim's next of kin have the

17  right to adequately and reasonably express your

18  views concerning the crime and the person

19  responsible.  And will you please re-identify

20  yourself for the record.

21          VICTIM MABRY:  My name is -- my name is

22  Matt Mabry and I'm the victim.  About five or

23  six weeks prior to the crime, ah, I had a

24  conversation with Mr. Patterson and it was

25  regarding his anger towards me or the issue that

26  -- that created this whole catastrophe.  At that

27  time I -- that's when I learned that Jody was a

1    manic-depressive and taking Lithium and Prozac

2    and on  -- these are prescription narcotics, I

3    guess is what they are.  To ah, help stabilize

4    his moods, and this conversation was probably

5    about 20 minutes long.  And Jody assured me that

6    there were no problems at the end of this

7    conversation, that we were okay.  So, over the

8    course of the next five or six weeks, well,

9    during that conversation Jody told me the job

10   was really stressing him out and I asked him,

11   why didn't he quit.  He said he couldn't afford

12   to and I told him that we had numerous other

13   jobs going and I could have him transferred to

14   another project if that's what he wanted.  And

15   that's what he said he wanted, so I called my

16   direct Supervisor, who handles all that, and a

17   couple of days passed, two, three days, whatever

18   it was ah, when I talked to my boss and then he

19   made some arrangements and then Jody was

20   transferred to another project.  Twenty days

21   later is the next time I saw Jody.  And that was

22   when he was trying to follow me.  The twen --

23   the next day was the day that he shot me.

24   There's a great span here.  When I talked to

25   Jody there wasn't a problem.  He assured me

26   there was no problem, there was no issues.  So,

27   I don't know if he was lying to me at that time,

1   or well -- I'm -- I'm pretty certain that he

2   was.  But he allowed this to -- to brew within

3   him and obviously ruined an awful lot of

4   people's lives.  Jody admits that he's got an

5   addictive personality and that concerns me.

6   Obviously he has a violent tendency or resorts

7   to violence 'cause that's already been proven.

8   My concern is, what happens the next time he has

9   a bad day.  Obviously there's a concern with him

10  coming back after me, but what about somebody

11  else?  I mean, he's in a control environment

12  right now, where he seems to be making great

13  progress and it seems that in his childhood,

14  when he was in somewhat of a controlled

15  environment, he did well.  But when he got

16  outside of that, when he moved to California to

17  become an adult, he got involved into drugs and

18  everything else and his whole life kinda, went

19  downhill, to some degree.  I believe that he

20  still has an obsession with me, it's been

21  probably, four parole hearings ago, when his

22  plans for parole -- he applied for jobs all

23  around the area where I live, which isn't near

24  where he lived.  I mean, there's an hour or so

25  difference, but he had all his references --

26  that really  concerns me.  I don't know if that

27  was a threat, I can't buy it as being a

115

72

1  coincidence.  I mean, he knows where I live.  I

2  knew the man for two years prior to this

3  shooting.  I'm really concerned about everything

4  that goes on with him, and I -- I -- I don't

5  believe that he tells us the truth.  His

6  attitude doesn't suggest any hostility to me,

7  but when I had a conversation five or six weeks

8  prior to the crime, he said he didn't have

9  anymore hostility to me.  He seems to be  -- it

10  appears to me that he's telling everybody what

11  he needs to -- what needs to be said in order

12  for him to gain parole.  Up until the last

13  hearing, he didn't even recall the crime.  He

14  said he'd blacked out, and at the last hearing,

15  he stated that he intended to kill me.  So I

16  think that again, he's being coached and told

17  what to do, as far as -- this is what it's gonna

18  take for you to get out of jail.  When we --

19  when Jody was transferred to another job, he

20  went to that job and caused some problems there

21  to some degree, was just kinda, maybe

22  argumentative or hostile and he quit that job.

23  And then he got another job on his own and he

24  quit that.  So, he had work, but he quit those

25  jobs and at the time of the sentencing, the

26  Judge, or Commissioner at the time, said that he

27  felt that Jody focused in on me as being all the

116

1  cause for all the problems in his life.  And he

2  felt that if he got rid of me, that that would

3  end all of his problems.  Well, he has some

4  obsession there and I know he knows right from

5  wrong, but what happens the next time something

6  doesn't go his way?  When he's not in a

7  controlled environment, who pays the price then?

8  I don't believe that Jody's fit for parole.  I

9  know he's going through the motions, I know he's

10  making progress, but I don't believe that ah,

11  that he's left this obsession with me.  If he

12  has, it's been in the last several years and

13  what happens when he gets back out -- if he gets

14  -- crawls back into his addiction?  What happens

15  then?  Then I have to fear for my life again,

16  and my family's life?  According to the State of

17  California, I'm 41 and a half percent

18  permanently disabled, and that's all directly

19  caused by him.  I don't have parole.  I don't

20  get any rehabilitation, I've gone through

21  numerous surgeries, and I'm permanent,

22  stationary where I'm at.  I still work within

23  the same trade, but I can't do what I used to

24  do.  I've had to move into more of a Management

25  type role.  This -- this has completely affected

26  everybody's life in my family.  I'm concerned

27  about my safety, my family's safety and the

117

74

1  general public and I don't feel that Jody is

2  telling the truth, and I don't believe that he's

3  fit for parole.

4        PRESIDING COMMISSIONER BRYSON:   Thank

5  you, Sir.   We'll now recess for deliberations,

6  the time is 11:30.

7                         R E C E S S

8                         --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

74                                      118

```
 1            CALIFORNIA BOARD OF PAROLE HEARINGS
 2                       D E C I S I O N
 3            PRESIDING COMMISSIONER DAVIS: All right,
 4   we've reconvened for the decision, in the matter
 5   of Jody Patterson.  Everyone who was prior in
 6   the room has returned to the room, and it's
 7   11:45.  Sir, the Panel reviewed all information
 8   received from you and from the public and relied
 9   on the following circumstances in concluding
10   that you're not yet suitable for parole and
11   would pose an unreasonable risk of danger to
12   society or a threat to public safety if released
13   from prison.  The offense was carried out in a
14   especially cruel and callous manner. As
15   Patterson's prior job foreman, the victim, Matt
16   Mabry, was indeed particularly vulnerable,
17   driving his pickup truck from the job site,
18   under the scrutiny of the inmate, who was
19   basically laying in wait for him.  The offense
20   was carried out in a dispassionate and
21   calculated manner, such as an execution style
22   murder.  After failing to take his prescribed
23   Lithium and Prozac for two days, the inmate lay
24   in wait for his former Supervisor, consumed beer
25   and marijuana and shot him with a rifle as he
26   was in his pickup truck.  The offense was
27   JODY PATTERSON   E-88649   DECISION   PAGE 1 8/2/06
```

1    carried out in a manner demonstrating an

2    exceptionally callous disregard for human

3    suffering, for public safety, that was at risk

4    from the  gun fire and you had a clear

5    opportunity to cease but you continued.  You had

6    argued with the victim, prior to your -- about

7    your poor workmanship -- prior -- as a dry-

8    waller and painter for Rainbow Industries and

9    had just been laid off.  As to the motive

10   itself, it was very trivial in relation to the

11   offense.  The victim had him transferred to

12   another jobsite, but the inmate returned and

13   surveilled the site prior to the shooting.  Sir,

14   you're to be commended for, number one, being as

15   frank as you have today.  That's very important

16   and you have been very frank, we believe, with

17   this Panel.  Ah, you do not have a significant

18   prior criminal record, you do of course have

19   poly-substance abuse history, which is a major

20   ah, issue, which you have fully acknowledged

21   here today.  As to your institutional behavior,

22   you have done commendable programming.  You have

23   -- you're consistently been working with average

24   to above average work reports, you have

25   performed self-study, in terms of education.

26   You have completed vocational certificate in

27   **JODY PATTERSON   E-88649   DECISION   PAGE 2 8/2/06**

76                    120

1    welding, which is a marketable skill ah, as well

2    as your prior job experience skills.  And you

3    have continuously ah, participated in AA, NA

4    addiction recovery and Anger Management and

5    Alternative to Violence programs.  So, this

6    Panel submits that you have in fact,

7    participated in self-help to the -- to a great

8    degree and more importantly, it appears that

9    you've gotten a great deal out of the self-help

10   programs.  You've been able to talk to us about

11   the Steps here today and clearly showing you've

12   internalized that information and that you would

13   have tools ready to apply in the outside world.

14   As to your ah, serious disciplinary violations

15   in prison.  You have three 115s and the concern

16   of this Panel is the 2004 refusal to obey 115.

17   You also have three 128a's, the most recent in

18   2001, failure to report.  128a's are not

19   nothing, a long list of 128a's shows that there

20   is -- there are issues going on ah, but you have

21   been free of 128a's, now for five years.  And

22   you only had three in your history.  So you have

23   a reasonable record, with the exception of that

24   last one 115.  As to the psychological report

25   for 2006, basically, you're given a good ah, ah

26   good report, it basically supports your parole

27   **JODY PATTERSON  E-88649  DECISION  PAGE 3 8/2/06**

78

1   and you're given a high global assessment of

2   functioning of 90.  Hum, you have presented to

3   this Board viable residential plans, as well as,

4   plans for your transition into a society, in the

5   U-Turn for Christ program, and in the marketable

6   skills you have.  And you certainly have

7   extensive, extended family support.  As to Penal

8   Code 3042 responses, responses indicate

9   opposition of finding of parole -- to finding of

10  parole suitability specifically by the District

11  Attorney of Orange County.  In denying you

12  parole for one year, we're placing you on the

13  2007 calendar for your next subsequent hearing.

14  The Board recommends first of all, no more 115's

15  or 128a's.  Continue with your self-help, that's

16  been obviously very successful in -- and your

17  succeeding in that program, so continue that.

18  Ah, we also put earned positive chronos, but

19  you're earning them, just by virtue of your good

20  work.  Ah, you also have a trade, upgrade it as

21  you have that opportunity.  Continue your good

22  program and your outreach and your parole plans.

23  And Sir, ah, I understand how this can appear to

24  be a set-back for you, but actually ah, one year

25  is not very much time, and if you continue in

26  the direction you're going, you have a very good

27  **JODY PATTERSON   E-88649   DECISION   PAGE 4 8/2/06**

7B                                122

1   prospect.  You appear to be getting a handle on

2   your issues, ah, and we would like to see more

3   distance ah, between ah, for you, from your last

4   disciplinary because we need to be confident

5   that in fact, you are going to be following the

6   rules outside as well as inside.  That becomes

7   simple -- simply the issue.  Do you have any

8   further?

9           DEPUTY COMMISSIONER BENTLEY:

10  (indiscernible)

11          PRESIDING COMMISSIONER BRYSON:  Thank

12  you, Sir.  That concludes this hearing, the time

13  is 11:50.

14          INMATE PATTERSON:  Thank you.

15                    --oOo--

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON: ___NOV 3 0 2006___

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  JODY PATTERSON   E-88649   DECISION   PAGE 5 8/2/06

79                            123

80

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, TAMA BRISBANE, owner of House of Scribes,
have designated ODELIA DORIA, a duly designated
transcriber with House of Scribes residing in the
State of Texas, to prepare the foregoing transcript.
With my signature I do hereby declare and certify,
under penalty of perjury, that I have directed her to
transcribe tape(s) that total one in number and cover
a total of 82 pages. The recording was duly recorded
at CALIFORNIA DEPARTMENT OF CORRECTIONS, CHUCKAWALLA
VALLEY STATE PRISON, and the foregoing pages
constitute a true, complete and accurate transcription
of the aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and its
transcribers are disinterested parties in the above-
mentioned matter and have no interest in the outcome
of the hearing.

Dated November 26, 2006, at Stockton,
California.

_Tama Bressane_
Owner, House of Scribes

BOARD OF PRISON TERMS                            STATE OF CALIFORNIA
LIFE PRISONER:  PAROLE CONSIDERATION PROPOSED DECISION:
DENY PAROLE

---

[✓] PAROLE DENIED FOR:        ① 2    3    4    5    YEARS

Place the prisoner on the ___2007___ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled.  The Board will send you a copy of the decision.  It will indicate the reasons you did not get paroled.  If this decision is not final, the Board will set up another hearing.  You can read the laws about your hearing.  You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**

[✓] No more 115's or 128A's              [ ] Learn a trade*
[ ] Work to reduce custody level         [ ] Get therapy*
[✓] Get self-help*                       [✓] Earn positive chronos
[ ] Stay discipline free                 [ ] Get a GED*

[ ] Recommend transfer to _____
[✓] Other ___Continue good programming, outreach,___
___and parole plans___

\* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

| Name | | Date |
|---|---|---|
| _S3ry_ | | _8/_ |
| _Carol J Bentley_ | | _/2/2006_ |
| | | |

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|
| _Patterson, Jody_ | _E 88649_ | _CTF-Soledad_ | _7/2/2006_ |

BPT 1005(b)
(REV 04/04)

Distribution: White-C File
Canary-BPT
Pink-Prisoner

125/